IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH AND SEIZURE OF<br><br>Apple iPhone 6S (ATF Item: 000001), seized by the Anchorage Police Department (17-2512SW) on September 25, 2017 | Case No. 3:19-mj-00181-DMS |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Brian Arnold, being duly sworn, hereby depose and state:

## TRAINING AND EXPERIENCE OF AFFIANT

1. I am a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been so employed since May 2015. I am a graduate of the Criminal Investigator Training Program and ATF Special Agent Basic Training program at the Federal Law Enforcement Training Center in Glynco, Georgia. I am currently assigned to the Anchorage, Alaska Field Office. During my tenure as Special Agent with the ATF, I have had the opportunity to serve as the lead case agent on federal criminal cases involving primarily firearms, explosives, and narcotics offenses. I have also directly participated in additional federal criminal cases in a support capacity. As the lead case agent, and also as a supporting agent, I have been involved in, and routinely engage in, conducting interviews, executing federal and state search warrants, recovering evidence of federal crimes, conducting covert surveillance operations, and conducting arrest operations.

2. Prior to my employment with the ATF, I served as an Integrated Supply Chain Manager and Supervisor at a Fortune 100 company in the aerospace avionics industry for over three and one half years. During this time, I supervised a team of approximately 25 employees and contractors engaged in site materials and logistics operations utilizing lean six sigma. Prior to this, I was an Active Duty United States Army Commissioned Officer of the Military Police Branch for over five years obtaining the rank of Captain. During this time, I commanded a company of approximately 125 soldiers in garrison and a platoon of approximately 40 soldiers through an almost 15-month deployment in support of Operation Iraqi Freedom. During the deployment, I took part in intelligence,

Page **1** of **18**

MAY - 2 2019

counterinsurgency, and combat operations against large international criminal/terrorist organizations. Additionally, as a part-time Army National Guard Captain, I worked in a Military Intelligence position for an Explosives Ordinance Disposal unit for over two years participating in multiple exercises involving explosives intelligence. I also have a Bachelor's degree in Criminal Justice and a Master's degree in Business Administration.

## PURPOSE OF AFFIDAVIT

3. This affidavit is prepared in support of an application under Federal Rule of Criminal Procedure 41 for a warrant to search an Apple brand device, specifically a silver-colored Apple iPhone 6S cellular telephone that the Anchorage Police Department seized from the vehicle Shane TWIGG and Myles GONANGNAN were found in on September 25, 2017 ("the SUBJECT DEVICE"), more fully described in Attachment A, attached hereto and incorporated by reference herein, for the items set forth in Attachment B, attached hereto and incorporated by reference herein. More specifically, the applied-for warrant would authorize the forensic examination of the SUBJECT DEVICE for the purpose of identifying electronically stored data particularly described in Attachment B. Both Attachment A and Attachment B are hereby incorporated by reference herein.

4. The cell phone (the SUBJECT DEVICE) seized in APD Cases: 17-039254 & 17-039264 is suspected to contain evidence, instrumentalities, and fruits of violations of Title 18, United States Code, Section 1951(a), Title 18, United States Code, Section 924(c), and/or Title 18, United States Codes, Section 922(g)(1). This affidavit is being submitted for the purpose of establishing probable cause. This affidavit contains facts sufficient to establish probable cause; however, it does not contain all of the facts known to me relating to this investigation.

## PROBABLE CAUSE

5. On October 19, 2017 Shane TWIGG and Myles GONANGNAN were indicted by a Federal Grand Jury for federal violations including 18 USC § 1951(a) (Hobbs Act Robbery) and 18 USC § 924(c) (Using a Firearm In-Furtherance of a Crime of Violence) in relation to a robbery and an attempted robbery of two coffee kiosks on September 25, 2017: Café Darte located at 1251 Boniface Parkway, Anchorage, AK and Heavenly Cup located at 8710 Lake Otis Parkway, Anchorage, AK.

6. According to written reports by APD Officers/Detectives (henceforth also referred to as APD Officers) involved (APD Cases: 17-039254 & 17-039264): On or about September 25, 2017 at approximately 0822 hours the coffee kiosk, Café Darte located at

1251 Boniface Parkway, Anchorage, AK reported to APD that they were robbed.

7. According to APD Officer Steve Alderman's report: an employee involved made statements about the incident including that an unknown white male was on a silver bike next to a Buick in the east side of the parking lot. The employee was attending customers on the west side of Café Darte, turned to address the customer window on the east side, and the male on the bike was in the window. The male stated "Don't freak out, I have a gun, give me all your money." She stated he pulled a silver revolver out, put it inside of the window, and began banging it on the side. She told the other employee to stay in the back, went to the register, and emptied all the cash.

8. In fear for her life and the life of her co-worker, the employee provided the male with approximately $1,200 in cash. She handed the cash to the unknown male and some of it dropped on the floor of the coffee shop. She stated he picked up all the cash, shoved both the cash and gun into the front collar of his sweater, and left northbound on Debarr Road.

9. The employee described the unknown male as white, with darker features/complexion, wearing dark sunglasses, a gray sweater, dark-colored jeans, a dark-colored beanie, and sideburns. The employee described the gun as a silver revolver, typically seen in old western movies that hold six or more shots. She stated that as he was putting the revolver into his shirt, she saw an orange tip on the barrel, which made her later think it was actually a BB or Airsoft gun. However, she believed the firearm to be real, despite the orange tip. She described the bike as tall, silver; possibly with some black on it, and that it had gears like a mountain bike. She said that they had cameras within the coffee shop, but the cameras facing the windows are decoys. She did not believe the suspect ever entered the coffee shop far enough to be recorded and that she would recognize the suspect, if seen again.

10. According to APD Officer Mindy Mitchell's report: a co-worker of the employee (mentioned above) made statements about the incident including that she had been in the back part of the coffee shack heating up a muffin for a customer when she saw the employee with her hands up in the air. She said she did not see the suspect because the employee told her to stay back. She stated she heard the suspect say things like, "Under there, all of it." She said she saw the employee give the suspect a plastic cup with cash in it and that she saw part of the gun, which she thought, was a silver pistol. She said the suspect sounded like he was a white male adult in his 30's. She said she was scared when the coffee shack was being robbed. Officer Mitchell observed that she was in tears and appeared to be shaking.

11. According to APD Officer Thomas Endress' report: a male witness made statements

MAY - 2 2019

about the incident including that he had been in line waiting for coffee and noticed there was a silver Buick Enclave parked behind the Holiday that looked suspicious. The Buick was sitting very low as if it had been loaded down. There was also a white male or native adult on a black "10-speed" bike. The Buick had pulled up from behind the Holiday just north of the coffee stand and stopped. The driver, a white male in his 20s or 30s with a dark t-shirt on appeared to give the male on the bike a "thumbs up" at that point the coffee stand was robbed. The male on the bike and the Buick both fled north on Boniface Parkway.

12. Additionally, Officer Endress noted that at approximately 0745 hours he had seen a silver Buick Enclave making a U-turn at Debarr and Boniface turning from south bound to north bound. He noted that it appeared to not have a front plate and the back was sagging as if it was loaded down with a lot of weight. He considered conducting a traffic stop, but was not in a good position.

13. On September 25, 2017 between approximately 0926 hours to 0927 hours, a coffee kiosk, Heavenly Cup located at 8710 Lake Otis Parkway, Anchorage, AK reported an incident to APD. According to APD Officer Horace Snyder's report: an employee's later statements about the incident included that a white male adult wearing a gray hoody with the hood up and riding a bike came up to the counter. She said the male began mumbling, unzipped his hoody exposing a handgun in a holster, and the employee backed up and went to the rear of the shop. The male then left on his bike and did not take any items. She stated when they saw the gun she was in fear and assumed the male was going to shoot her. She said the incident was caught on security cameras.

14. Officer Snyder reviewed security camera footage of the incident and observed the passenger of the suspect vehicle (mentioned below) ride a bike up to the window, unzip his hoody, and reach for a gun. The video then showed the employee heading to the rear of the store. Another barista was at the middle of the shop, but she had no idea what was going on until it was over.

15. According to APD Detective Ross Henikan's report interviewing APD Sergeant (Sgt) Noel Senoran: after the Heavenly Cup attempted robbery, the described suspect vehicle was observed by APD Sgt Senoran traveling west bound on Dimond Boulevard heading away from the crime scene. APD Sgt Senoran described the vehicle as "squatted down" and he knew this was the vehicle (being described as the suspect vehicle). Another APD Officer also reported the vehicle being described as "sagging." APD Sgt Senoran followed then attempted to stop the vehicle, but the vehicle refused to stop and was pursued.

16. In the area of Dimond Boulevard and C Street in Anchorage, shots were fired from

within the silver Buick at APD Sgt Senoran. An APD Sgt Senoran's vehicle was impacted by the bullets and he returned fire at the Buick. After a chase, APD Officers successfully stopped the suspect vehicle (Year: 2004, Color: Silver, Alaska Plate: ENW154, VIN: 5GADT13S542191003) near the entrance to the Dimond Costco in Anchorage, Alaska.

17. When later reviewing an APD in-car video, I observed that a silver object consistent with a handgun was quickly thrown into the back of the SUV once the suspect vehicle was stopped. The occupants were taken into custody without further incident.

18. The driver of the vehicle was identified by APD Officers as Shane TWIGG and the passenger as Myles GONANGNAN. GONANGNAN was observed by police wearing a black chest holster. Both subjects were transported to APD headquarters. APD Officers observed in plain view inside the vehicle a bicycle, a handgun, shell casings, and several bullet holes that appeared to have traveled from the inside of the suspect vehicle outward.

19. According to Officer Snyder's report: after taking TWIGG into custody, he began making statements that the passenger was the one who shot at police and the passenger threatened to kill him if he did not keep driving. Multiple Officers reported hearing GONANGNAN make spontaneous utterings including statements to the effect that he was "God," his name was "Lawless," talking about death, and suicide.

20. Both subjects were interviewed by APD Detectives. TWIGG was Mirandized; he waived his rights, and was interviewed by APD Detective Leonard Torres. According to Detective Torres' report: TWIGG made statements to the effect including that he did not know his home address, but described the location of an apartment. He said this was his girlfriend "Lindsey Clark's" apartment and that he spent the previous night there.

21. TWIGG said that he did not own a phone own a phone and that the phone that he had, that was still in the truck, belonged to a friend of his girlfriend. The friend, a Samoan girl named "Silani", was also currently at their apartment. TWIGG said he drove his girlfriend's vehicle. When asked about what was in the vehicle, he mentioned items including that the man threw the gun at the end. When asked what time he left his apartment that morning he eventually said around 0900 hours then changed to about 0800 hours. TWIGG said he was by himself headed to a friend's house when he pulled over at the little Red School House located on Lake Otis Parkway just before Abbott. As he pulled out, he saw a man on a bike and they almost hit each other. According to TWIGG, the man was persistently waving him down so he pulled over and got out of his truck.

22. TWIGG said that the man came up behind him and pulled out a gun and told him to open the trunk of his vehicle. TWIGG did so and the man then tried to put the bike in his

Page 5 of 18

trunk and told him to put the bike in the trunk, which he did. TWIGG thought he was just going to take the truck, but as the man went around the other side of the vehicle, he told TWIGG to get in or he would shoot him. TWIGG got in and saw the man take off his hoody and hat. The man told him to turn by 80th near Carrs and the Long Branch Saloon. TWIGG said the man was crazy and was telling him that he was the savior and was going to save TWIGG's soul. TWIGG said he know that the man would kill him without hesitation. They drove by the Dimond Center and the man had a big wad of cash and tried to give some of it to TWIGG. The man was trying to be nice and spoke with TWIGG. The man then offered him some of the money for the ride and TWIGG told him that he did not want it and to tell him where he wanted to go. The man insisted that he take the money, took off his sweatshirt, gave TWIGG the $1s, $5s, and $10s of the money that he had, and the man kept the larger bills.

23. While driving, TWIGG noted a police officer behind him and he tried to get the officer to pull him over. The man noticed the police following them he told TWIGG that he would shoot him before shooting the cops if he did not try to get away from them. TWIGG said that the man hit him in the right side of his ribs on one occasion while threating to kill him if he did not get away. TWIGG said the police hit his vehicle from behind and he hoped this would have disabled his car, but did not.

24. TWIGG said that as he turned onto C Street, the man reached over the back seat and started shooting at the police. The man also put the gun to TWIGG's head. TWIGG grabbed the gun, pushed it away from his head, and the man fired the gun. TWIGG described the gun as a big giant cowboy gun. TWIGG said that after being hit by police, the man threw the gun at the police and exited the vehicle. TWIGG was also able to see that the man was wearing a chest holster with bullets in the holster.

25. TWIGG denied that he was involved in any of the robberies, continued to state that he did not know the man, and maintained that he had really been car jacked. TWIGG later stated that the man told him that he knew TWIGG from jail and TWIGG confirmed it was possible they had been in jail together.

26. According to APD Detective James Estes's report: On September 27, 2017, he viewed video footage from a security camera from outside an apartment in Anchorage that was provided by the property owner. This is the residence of a female believed to be TWIGG's girlfriend, (Lindsey Clark) and the owner of the vehicle involved (2004 Buick AK license plate: ENW154).

27. Upon review of the footage from September 25, 2017, Detective Estes observed a male whom he believes was Shane TWIGG exit the apartment at approximately 0738 hours (date/time displayed on video) with a black mountain bike that had front shocks

MAY - 2 2019

similar to that of the bicycle found in the back of the vehicle TWIGG was driving. At approximately 0747 hours, the same male exited the apartment and sat on the bicycle and at approximately 0749 hours, he rode off eastbound. At approximately 0753 hours, Detective Estes observed a male he believed was Myles GONANGNAN walk up to the apartment and at 0754 hours, the male left the view of the camera. Detective Estes provided me a comparison between footage photos and photos of both TWIGG and GONANGNAN from later that day and I observed that they had very similar physical and clothing descriptions. Being that the robbery of Café Darte was at approximately 0822 hours, this would be shortly before the robbery occurred.

28. According to APD Detective Christina Robert's report: a witness who had seen an article about the robbery from the day before recognized the vehicle involved as being in the alley behind his business around 0919 hours. He stated that one of his driver's saw a male loading a bike into a vehicle. He showed Detective Robert's camera footage dated September 25, 2017 which covers the front gate and northern portion of the intersection at 85th and Arlon Street. Detective Roberts' observations of the video included that at 0919 hours, a light colored SUV with no front plate is seen driving northbound on Arlon and then

29. On October 12, 2017 I further reviewed the footage taken from multiple cameras at the apartment TWIGG was staying in (also reviewed by Det. Estes above) from the morning of September 25, 2017 (see apartment footage files). The camera footage appeared to display on a low light setting and was not in color. The date/time is displayed on the video, the video appears to show the area outside a door of the apartment from two angles (CAM 1 & CAM 8) in addition to other areas outside the building (CAM 5 & CAM 6). My observations included the following:
- On CAM 1 at 0738 hours, an individual believed to be TWIGG (henceforth referred to as TWIGG) exits the apartment with a black mountain bike that was similar to that of the bicycle found in the back of the vehicle TWIGG was driving. He enters the apartment shortly afterward leaving the bicycle outside.
- On CAM 1 at 0747 hours, TWIGG exits the apartment, places a drink of some sort on the deck railing, puts on a beanie or winter hat, and sits on the bicycle while smoking a cigarette.
- On CAM 1 at 0748 hours, TWIGG pulls what appears to be a cell phone from his right front sweater pocket and appears to use it for a few seconds. (see photos below)

 

- On CAM 1 at 0749 hours, TWIGG rides the bicycle out of view of the camera.
- On CAM 5 at 0749 hours, an individual believed to be TWIGG is seen riding a bicycle.
- On CAM 6 at 0749 hours, TWIGG rides a bicycle up behind a 4-door SUV. The SUV matches the description of the one stopped by APD later that day containing TWIGG and GONANGNAN. The rear of the SUV and TWIGG are just out of view of the camera.
- On CAM 6 at 0750 hours, in the bottom left of the footage, a partial view of what appears to be the front of a bicycle is visible put into camera view next to the rear passenger side door of the vehicle.
- On CAM 6 at 0750 hours, TWIGG opens the driver's side door then walks to the back of the SUV and out of view of the camera.
- On CAM 6 at 0751 hours, just on the edge of the camera's view, it appears the rear hatch of the vehicle is opened.
- On CAM 6 at 0751 hours, TWIGG opens the rear passenger side door and appears to be reaching inside the vehicle and moving around as if to be moving seats or objects.
- On CAM 6 at 0752 hours, TWIGG moves the front of the bike out of view. The rear hatch of the SUV still appears to be open.
- On CAM 6 at 0752 hours, it appears that the rear hatch is closed, someone out of view closes the rear passenger door, then TWIGG comes back to the driver's side door, enters the vehicle and closes the door.
- On CAM 8 at 0752 hours, an individual believed to be Myles GONANGNAN (henceforth referred to as GONANGNAN) walks up to the apartment.
- On CAM 1 at 0753 hours, GONANGNAN can be seen closer up at the door of the apartment.
- On CAM 1 at 0753 hours, GONANGNAN walks away from the front of the apartment out view of the camera.
- On CAM 8 at 0753 hours, GONANGNAN walks away from the front of the apartment past the camera.

Page **8** of **18**

MAY - 2 2019

- On CAM 6 at 0753 hours, GONANGNAN opens the front passenger side door and enters vehicle.
- On CAM 6 at 0754 hours, GONANGNAN exits the front passenger side of the vehicle and moves out of view of the camera.
- On CAM 8 and CAM 1 at 0754 hours, GONANGNAN is seen walking up toward the door of the apartment, looking around, then coming back the way he came.
- On CAM 6 at 0754 hours, GONANGNAN returns and enters the front passenger side of the vehicle.
- On CAM 6 at 0755 hours, the SUV backs up and drives away out of view of the camera. The rear of the vehicle is observed which matches the vehicle description of the one stopped by APD later that day containing TWIGG and GONANGNAN.

30. On October 17, 2017 I reviewed the search warrant (17-2512SW) executed by APD on September 25, 2017 on the suspect vehicle, property seized list, and photos taken by APD of the suspect vehicle and other APD vehicles involved. Upon review of the search warrant property seized list and the photos, I observed that it appeared that items taken from APD Sgt Senoran's damaged vehicle were comingled together on the property seized list on the search warrant (17-2512SW) served on the suspect vehicle (AK Plate: ENW154). The search warrant property seized listed items I believe to be from the suspect vehicle and included an Apple iPhone 6S (the SUBJECT DEVICE) with a cracked screen located on the center console (see photos below):

  

31. On November 28, 2017 I obtained the SUBJECT DEVICE that according to TWIGG was owned by "Silani" listed above from APD. I later charged the SUBJECT DEVICE, observed that it had previously been placed into airplane mode, and observed the following photo on the locked screen:

MAY - 2 2019

Page 9 of 18

Case 3:19-mj-00181-DMS   Document 1-1   Filed 05/02/19   Page 9 of 18



32. On APD Det. Torres' recorded interview with TWIGG (Recording: H9PP1681), TWIGG made statements to the effect including that the phone (SUBJECT DEVICE) he had in the car was borrowed from his girlfriend's friend "Silani", that "Silani" was a Samoan girl, that he was using "Silani's" phone and did not have a phone himself, that he did not know the phone number for the phone, that the phone was locked, that she ("Silani") told him the password, that he recalled the password was "4135", that he had accidentally locked it up when trying to send a text message when he had stopped at the Little Red School House, that it was an iPhone, that it was "Silani's" only phone, that he woke "Silani" up at his girlfriend's house and asked if he could borrow her phone, and "Silani" stayed at his girlfriend's house last night.

33. The investigation has identified "Silani" is Salani Fuatai FATIALOFA.

34. On December 12, 2017 I established phone contact with a female who identified herself as "Salani" (heneceforth referred to as FATIALOFA) and when asked she confirmed that the SUBJECT DEVICE was hers. When I requested to meet in-person and asked her to provide a passcode for the phone, FATIALOFA declined. She additionally stated that we should release the phone to TWIGG.

## THE SUBJECT DEVICE

35. On November 28, 2017 ATF took custody of the SUBJECT DEVICE from APD and later executed a federal search warrant (3:17-mj-00523-DMS) on the device using a vendor to gain access to the password protected SUBJECT DEVICE and extract the stored data. I was later provided an encrypted hard drive (ATF Property Item #000005) from the vendor that contained the extracted data from the SUBJECT DEVICE. However, I have been unable to gain access to the encrypted hard drive despite the vendor's assistance in the matter.

MAY - 2 2019

36. On May 02, 2019, I spoke with a representative of the vendor who confirmed the password or passcode for the SUBJECT DEVICE is "031741". They also confirmed that after a number of failed attempts to gain access the encrypted hard drive, it erases the stored data. Based on my observations of the encrypted hard drive, it appears that the data that was contained therein has been erased. (a separate device provided by the vendor BA 05/02/2019) Therefore another search warrant is requested for the SUBJECT DEVICE. BA 05/02/2019

37. As explained below, searches of digital evidence by law enforcement even for ~~months~~ years BA 05/02/19 after their seizure does not compromise the likelihood that a search of those devices will yield evidence of the crimes detailed above.

38. I am familiar with smartphones including those like the Apple iPhone 6S cellular telephone described above and more fully in Attachment A. In addition to call logs, voicemail, and text messages, I know that those phones can contain historical GPS locational information regarding where the phone was located at a particular time and date, can store photos and videos, and can email or text individuals from their smartphone. There are also numerous apps available to smart phone like the SUBJECT DEVICE that can be used to communicate with other individuals electronically, including through email, SMS, chat applications, and social media. In addition, these facets of smartphones like the Apple iPhone 6S smart phone can be helpful in determining who was using the phone at a particular moment in time. I also know from my training and experience that these types of electronically stored data can provide evidence, or otherwise further investigations of, violations of 18 U.S.C. § 1951(a), 18 U.S.C. § 924(c), and/or 18 U.S.C. § 922(g)(1), and can also assist with identifying additional individuals involved in those crimes.

39. Based on the facts detailed herein, and the fact that the SUBJECT DEVICE was in TWIGG's immediate possession at the time APD arrested him on September 25, 2017, it is likely that Shane TWIGG was using the SUBJECT DEVICE before, during, and after the offenses. Moreover, as explained above, there is probable cause to believe that the SUBJECT DEVICE contains evidence of violations of 18 U.S.C. § 1951(a), 18 U.S.C. § 924(c), and/or 18 U.S.C. § 922(g)(1).

## CELLULAR TELEPHONE / FORENSIC ANALYSIS TECHNICAL TERMS

40. I believe that the SUBJECT DEVICE may contain evidence that shows violations of 18 U.S.C. § 1951(a), 18 U.S.C. § 924(c), and/or 18 U.S.C. § 922(g)(1) or tends to show that a particular person or persons has/have committed violations of these statutes, and I therefore request authority to search the SUBJECT DEVICE for the following property and evidence:

a. Data that may identify the owner or user of the above-described cellular communication device(s);

b. Address books and calendars;

c. Audio and video clips related to the above-described criminal activity and further described in this affidavit in support of the search warrant, for the above-described item(s);

d. Call histories and call logs related to the above-described criminal activity and further described in this affidavit in support of the search warrant, for the above-described item(s);

e. Photographs and associated metadata related to the above-described criminal activity and further described in this affidavit in support of the search warrant, for the above-described item(s);

f. Text messages (SMS), multimedia messages (MMS), recorded messages and subscriber information modules [SIM cards] between TWIGG, and other co-conspirators involved in the above described criminal activity and further described in this affidavit in support of the search warrant, for the above described item(s);

g. Stored voicemail on the device;

h. E-mail messages and attachments, whether read or unread and related to the above-described criminal activity and further described in this affidavit in support of the search warrant, for the above-described item(s);

i. Internet World Wide Web (WWW) browser files including, but not limited to, browser history, browser cache, stored cookies; browser favorites, auto-complete form history and stored passwords;

j. Global position system (GPS) data including, but not limited to coordinates, way points and tracks; and

k. Documents and other text based files related to the above-described criminal activity and further described in this affidavit in support of the search warrant, for the above-described item(s).

MAY - 2 2019

41. The executing special agents may enlist the aid of a law enforcement computer forensic laboratory in the searching, viewing, photographing, recording, copying, forensic imagining and analysis.

**DEFINITIONS**

42. Metadata is generally defined as data about data. It is stored within the data file itself, but is not normally seen when viewing the file. Metadata includes Exchangeable Image File Format (EXIF), which is a specification for image file formats used by digital camera and includes specific information about the photograph.

43. Short Message Service (SMS) is the text communication service that allows the exchange of short text messages between mobile phone devices.

44. Flash memory devices are data storage devices that use solid-state memory to store data. They are generally small in size (in some cases smaller than a fingernail) and designed to be easily removed and transported. They are typically powered by the electronic components they serve. Modern flash memory devices are capable of storing large amounts of information, such as hundreds of images or thousands of pages of text. Multimedia Message Service (MMS) is a communication service that allows the exchange of messages that include multimedia content to and from mobile phones. Subscriber Identity Modules, sometimes referred to as SIM cards, are portable memory chips often used in notebook computers and some models of mobile phones. SIM cards securely store the service-subscriber key used to identify subscribers. The SIM card allows users to change phones by simply removing the SIM card from one mobile phone and inserting it into another mobile phone or broadband telephony device. SIM cards store information used to authenticate and identify subscribers, including but not limited to the Service Provider Name, Service Dialing Numbers and Value Added Service applications. They can also be used to store personal address books and SMS data.

45. The Global Positioning System (GPS) is a satellite-based navigation system, which provides location and time information.

**ELECTRONIC COMMUNICATION DEVICES, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

46. I know from my training and experience that modern cellular communication devices like the SUBJECT DEVICE very often possess data processing and data storage capabilities that were previously only found in computers. Cellular telephones, personal digital assistant (PDA) devices and "smart phones" are becoming more complex with each innovation and provide features and capabilities that were previously only found in computers. Most of

MAY - 2 2019

these devices now provided Internet web browsers, instant messaging capabilities, chat programs, voice mail, e-mail access capabilities, and mapping capabilities. These devices are capable of storing address books and calendars containing a person's personal and business contacts. They can also store audio and video clips, call histories, call logs, photographs, text and recorded messages/voice mail sent and received and subscriber information. Many of these devices contain high resolution still and video cameras, and include Global Positioning System (GPS) functions that record data about the phone's locations including tracks, ways points and even the coordinates where photographs were taken.

47. Searching digital evidence systems like the SUBJECT DEVICE for criminal evidence requires experience in the computer and cellular telephone field and a properly controlled environment in order to protect the integrity of the evidence and recover even "hidden," erased, compressed, password-protected, or encrypted files. Since digital evidence is extremely vulnerable to tampering or destruction (both from external sources and from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

48. As further described in Attachment B, this warrant seeks permission to locate in the SUBJECT DEVICE not only computer files that might serve as direct evidence of the crimes described in this affidavit, but also for evidence that establishes how the SUBJECT DEVICE was used, the purpose of its use, and who used it. Further, as described above and in Attachment B, this application seeks permission to search and seize records that might be found in the SUBJECT DEVICE, in whatever form they are found. One form in which the records might be found is that they are stored on a computer's hard drive, or other electronic media. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis of the SUBJECT DEVICE.

49. Law enforcement personnel trained in searching and seizing computer data will seize items of evidentiary value, and transport the same to an appropriate law enforcement laboratory for off-site review. The electronic media will be reviewed for the evidence described in Attachment B, pursuant to the filter team agent protocol described above.

50. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been on electronic devices like the SUBJECT DEVICE. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily available forensics tools. When a person "deletes" a file, the data contained in the file does not actually disappear; rather, that data

Page 14 of 18

MAY - 2 2019

Case 3:19-mj-00181-DMS   Document 1-1   Filed 05/02/19   Page 14 of 18

remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space - for long periods of time before they are overwritten. The search for these files and file fragments can take considerable time, depending on the computer user's practices.

## SPECIFIC METHODS OF SEARCHING FOR DIGITAL EVIDENCE

*Seizure of Digital Evidence*

51. I am seeking authority to search for, among other things, items containing digital data, more particularly described in Attachment B. Consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

52. The search of electronic devices like the SUBJECT DEVICE can be a time-consuming manual process often requiring months of work. This is so for a number of reasons, including the complexity of these phones, the multiple devices upon which computing can take place, and the tremendous storage capacity of modern day smart and cell phones, and the use of encryption or wiping software. Modern day cell phones like the SUBJECT DEVICE hold sizeable quantities of data. I know from my training and experience, and from my discussions with a trained digital media collection specialist, that a review of such quantities of evidence can take a significant amount of time. Second, there is a limited pool of personnel capable of conducting an examination. Third, in some instances an individual may utilize encryption software or other publically available techniques such as wiping software to hide evidence. Forensic tools are available to circumvent some of these techniques; however, these tools may require a significant allocation of resources and a substantial period of time.

53. With rare exception, the above-listed search techniques will not be performed on original digital evidence. Instead, I know that the first priority of a digital evidence forensic examination is the preservation of all data seized. As such, tools will be utilized to examine the SUBJECT DEVICE that will preserve the original evidence in the best possible format.

54. Criminal Procedure Rule 41 specifically states, "The officer may retain a copy of the electronically stored information that was seized or copied." Fed. R. Crim. P. 41 (f)(1)(B).

Moreover, upon identification of contraband, the item is subject to forfeiture, and the owner has a reduced expectation of privacy in those seized devices. Consequently, should a seized device be found during the authorized forensic review to be an instrumentality, or contain evidence of a crime, it will be retained by the United States, and may be searched without further authorization of the Court for the evidence described in Attachment B. Such a later search may be required for the following reasons:

- Should the execution of the warrant uncover data that may later need to be introduced into evidence during a trial or other proceeding, the authenticity and the integrity of the evidence and the government's forensic methodology may be contested issues. Retaining copies of seized storage media may be required to prove these facts.

- Returning the original storage medium to its owner will not allow for the preservation of that evidence. Even routine use may forever change the data it contains, alter system access times, or eliminate data stored on it.

- Because the investigation is not yet complete, it is not possible to predict all possible defendants against whom evidence found on the storage medium might be used. That evidence might be used against persons who have no possessory interest in the storage media, or against persons yet unknown. Those defendants might be entitled to a copy of the complete storage media in discovery. Retention of a complete image assures that it will be available to all parties, including those known now and those later identified.

- The act of destroying or returning storage medium could create an opportunity for a defendant to claim, falsely, that the destroyed or returned storage medium contained evidence favorable to him. Maintaining a copy of the storage medium would permit the government, through an additional warrant if necessary, to investigate such a claim.

- Similarly, should a defendant suggest an explanation for the presence of evidence on storage medium or some defense, it may be necessary to investigate such an explanation or defense by, among other things, re-examining the storage medium with that explanation or defense in mind. This may require an additional examination of the storage medium for evidence that is described in Attachment B but was not properly identified and segregated previously.

55. In the event that the SUJBECT DEVICE is found not to be (a) an instrumentality of the offense, (b) a fruit of the criminal activity, (c) contraband, or (d) evidence of the offenses specified herein, it will be returned as quickly as possible.

## UNLOCKING THE SUBJECT DEVICE

56. As described in Attachment A, the Subject Device is an Apple brand device, specifically Apple iPhone 6S cellular telephone (Model: A1633, FCCID: BCG-E2946A, IC: 579C-E2946A). I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of Apple devices such as iPhones and iPads offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") or by a numeric or alphanumeric passcode or password. The numeric or alphanumeric passcode or password ("031741") to unlock the SUBJECT DEVICE is now known because the vendor who assisted in executing federal search warrant (3:17-mj-00523-DMS) was able to obtain the passcode or password and they provided it to law enforcement.

## CONCLUSION

57. Based on the above, your Affiant respectfully submits that there is probable cause to believe the SUBJECT DEVICE found in the vehicle by APD contains evidence, instrumentalities, and fruits of violations of Title 18, United States Code, Section 1951(a), Title 18, United States Code, Section 924(c), and/or Title 18, United States Codes, Section 922(g)(1).

58. The information in this affidavit is based on my personal knowledge, as well as information provided to me by other law enforcement officers, and individuals directly involved in the investigation of this case. The information in this affidavit is provided for the limited purpose of establishing probable cause and is not a complete statement of all the facts related to this case. This affidavit is made with the information made available and reviewed by me to date, however the investigation is still ongoing.

BRIAN ARNOLD
SPECIAL AGENT
BUREAU OF ALCOHOL, TOBACCO,
FIREARMS and EXPLOSIVES (ATF)

Sworn and subscribed before me in Anchorage, Alaska
this 2 day of ~~December 2017~~ May, 2019

MAY - 2 2019

/S/ DEBORAH M. SMITH
CHIEF U.S. MAGISTRATE JUDGE
SIGNATURE REDACTED

UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
DISTRICT OF ALASKA

MAY - 2 2019